IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JEANNINE ARPIN, as Administrator
of the Estate of RONALD ARPIN,
Deceased,

      Plaintiff,

vs.                                No. 04-CV-128-DRH

THE UNITED STATES OF AMERICA,
ST. LOUIS UNIVERSITY,
a not-for-profit corporation,

      Defendants.

## ORDER FOLLOWING BENCH TRIAL

Herndon, District Judge:

### I. Introduction

The day of a follow-up  physical examination with Dr. Asra Khan was Jeannine and Ronald Arpin's 35th wedding anniversary.  They did not know it would be the day that Dr. Khan, a  second-year resident, and an Air Force Captain, Dr. James Haynes, who was charged with the duty to properly supervise her, sealed the fate of this husband, father, war hero and welder.

Ronald Arpin  a U.S. Army veteran, spent  sixteen years connected to the Army; eight years active and eight years in reserve.  Jeannine, his wife, met him at Fort Leonard Wood.  Her husband of thirty-five years saw a tour of duty in Korea and three  tours of duty in Vietnam.  He was a decorated war hero, having been awarded the Silver Star and a Purple Heart.

Was it friendly fire or blatant disregard for the life of this war hero that took him away from his family and country?    Ronald Arpin, long out of the Army, was of late living only to protect his family, in a country for which  he had already given so much.  The Court decides it was a blatant, or at least reckless disregard, for the life of Ronald Arpin that cost him his life.  Though time was not in short supply, the two doctors who are the subject of this legal examination treated it as though it was more important than this war hero's life.  It wasn't.  He suffered immeasurably. His family suffers and will continue to suffer and it didn't have to happen.

The damages the Court awards include medical bills: Medstar Ambulance: $372.80; St. Elizabeth's Hospital $55,885.25; Arch Air Medical Services $5,800.00; St. Elizabeth Belleville Family: $660.00; Belleville Radiologists $1,319.00; Neurological Service Belleville: $195.00; Dr. Zahid $1,570.00; SLUCARE-St. Louis University $5,845.00; and, St. Louis University Hospital $87,014.26. Also,Valhalla Funeral Home: $2,207.96. In addition, the Plaintiff will be compensated on the survival claim in the amount of $750,000.00 in non-economic damages. The Plaintiff will also be compensated for wage loss damages in the amount of $354,140.00, plus non-economic damages in the amount of $7,000,000.00 (apportioned as follows: Jeannine Arpin in the amount of $4,000,000.00; Ronnie Arpin in the amount of 750,000.00; Steven Arpin in the amount of $750,000.00; Pamela Jean Arpin-McDill in the amount of $750,000.00 and Cheryl Arpin Stallings in the amount of $750,000.00).  The total damages awarded in favor of the Plaintiff and against both Defendants, jointly, is $8,265,009.27.  The Court now **FINDS** and **CONCLUDES** as

2

follows.

## II. <u>Findings of Fact</u>

1.      On September 19, 2001, Ronald Arpin fell from a chair while working for T.

J. Gundlach Machine Co.  Falling some three feet, Plaintiff's decedent landed on his

right hip.  He did not seek immediate medical attention.

2.      Upon arriving at home from work, later that same day, Arpin, in considerable

pain, discussed with his wife, Jeannine, the workplace injury.  They had discussed

it earlier by phone.  Jeannine Arpin encouraged her husband to seek immediate

medical care, but, consistent with his nature, Ronald Arpin opted to wait out the

condition to see if it would improve after sleeping.  This particular evening was

unusual, in that, he had begun work much earlier in the day due to the requirement

to take a test.  This put him at home at 8:45 p.m., rather than the usual 1:00 a.m.

in the early morning hours of the next day.

3.      Unable to make it through the night sleeping, her husband awakened by

intense pain, Jeannine Arpin called for an ambulance at 4:39 a.m.  According to the

Patient Report Form supplied by the emergency medical technician's who were the

first medical providers for this ill-fated patient, they found him barely able to walk

and recorded a 9/10 on the pain scale.  An IV was established and per instructions

from the ER he was medicated with morphine.   It is noted by the Court that despite

his suffering a 9/10 on the pain scale his skin moistness was noted to be normal,

skin color was noted to be normal, and skin temperature was normal.  It did not

appear that pain alone caused him to sweat, go pale or skin temperature to rise or

fall, at that point in time. (See, Plaintiff's Ex. 5.)

4. During his ER examination, staffed by a physician associated with the Family Practice Center of Belleville, Mr. Arpin, despite the presence of Morphine in his system, reported a pain level of 8/10. He was given 30 mg of Toradol by IV, 50 mg of Demerol intramuscularly, and 50 mg of Vistaril intramuscularly. He was diagnosed as having an acute lumbo-sacral strain and released with instructions to obtain prescriptions of Vicodin and Flexaril. He was to pursue bed rest for two days and remain off work for four days, seeking the further advice of his own physician or, if he had none, the Family Practice Center (Dr. Laffey or the on call physician) in seven to ten days if he had not improved. (See, Plaintiff's Ex. 5.)

5. Not only did Ronald Arpin fail to improve, he declined in health to the point that he died with multiple diagnoses including intraspinal abscess, staphlococcus aureus septicemia, shock, and acute renal failure. He started with a psoas edema on September 19, 2001 which resulted from his fall at work. That progressed to a psoas abscess, which is the focus of this litigation and for which the above provides the necessary background, but the Court gets ahead of himself.

6. For a bit more background, by way of corroboration, during the 20th through the 23rd of September, Ronald Arpin continued to suffer immensely and with increasing severity. His pain continued to increase in severity, despite his continued and regular use of the strong medication he was prescribed. He could not walk unaided. He did not leave his recliner except in the initial days to use the toilet. As he sat in the recliner, tilted back, he flexed his right hip and knee with the hip rotated

4

inward (perhaps a medical anomaly or a medical necessity to remove weight from his injured hip) at all times.

7.      During a family get together on the afternoon of the 23rd (meant to celebrate the 35th anniversary of the next day), attended by all his children, everyone noticed that he appeared really ill, pale or grayish in color, clammy, sweaty (wiping his brow regularly), with his shirt damp from the sweat, and short of breath.  Suggestions by more than one family member that he go to the hospital were met with the response that his doctor appointment was the next day and he would wait for that.

8.      The fact that Ronald Arpin was sweating, his skin was clammy, his skin color was pale or gray, short of breath, his best position of comfort was in a reclined position (as opposed to a prone position) with his right hip and knee flexed, even if it was rotated inward, demonstrates that by the 23rd of September, 2001, he was beginning to develop a psoas abscess and it was detectable by a medical professional reasonably performing according to the standard of care for diagnosing such conditions.  The Court found the testimony of the Arpin family on the issues of pain, perspiration, skin moisture, shortness of breath, and skin color to be completely credible.

9.      Ronald Arpin kept the earlier doctor's appointment that was made for him on September 24th, rather than wait the seven to ten days he was originally advised. With great difficulty, his wife and daughter, Pamela Arpin McDill, got him into the car and into the doctor's  office.  The Court finds that from the time Ronald Arpin got into the examining room until he struggled out with his wife and daughter, twenty

minutes passed.  However, only approximately four minutes of that time was actually

spent with Dr. Asra Khan, the second year resident assigned the duty of Mr. Arpin's

examination that day.  Some time was spent with nurse Pamela Asbury asking the

patient's chief complaint and telling him and his family how the clinic operates.

10.     The Court specifically finds that nurse Asbury's testimony is not credible on

issues related to her activities with and observations of the patient.  She felt certain

that if she had been told or observed that Mr. Arpin was sweaty, clammy, pallor,

feverish, or short of breath, she would have recorded those things.  She also testified

that she had the patient on the examining table and it is clear that she did not, as

that did not happen until the doctor came into the room.  Clearly her recall of the

events of that day are suspect and the Court finds her credibility as a historian to be

lacking.

11.     In observing the testimony of Dr. Khan, Dr. Haynes, Jeannine Arpin, Pamela

Arpin McDill, and reading the dictated and typewritten note of the examination by Dr.

Khan, the Court finds the following to be the credible recitation of the examination

by Dr. Khan of Ronald Arpin on September 24, 2001.  When Dr. Khan came into the

examining room, Mr. Arpin was still in a chair leaning back and favoring his right

hip.  He was asked by the doctor if he could get on the examining table and he

responded negatively by shaking his head.  Undaunted, the doctor advised he must

get on the table, whereupon, with great difficulty, Mr. Arpin, with the help of his wife,

daughter and the doctor, struggled and  inched his way up onto the table.  Once on

the table, the patient did not lay back but leaned back on his elbows, still favoring his

6

right side by leaning to his left with his right hip and knee flexed. What was noticeable was that whether in the recliner, office chair or on the examining table, Mr. Arpin always attempted to assume a similar position; bent at the waist, hip flexed, weight off his right hip, right hip flexed more than the left and the right knee flexed and in a position to aid in taking weight off of the right hip. Dr. Khan did not ask about the obvious positioning and if one position gave him more comfort than another even though he clearly was attempting to replicate on the examining table what he was doing in the office chair (and what he had done at home). Mrs. Arpin advised the doctor that she was worried about her husband's lack of appetite, that he was sweaty, cold, clammy, color poor, and that his pain was worse. Mrs. McDill told the doctor that her dad was short of breath. The doctor asked where he hurt and he indicated in his right hip. The doctor felt and squeezed his hip and the surrounding area. She pushed his right leg down to straighten it, which was met with a **loud** scream of pain by the patient. (The word "loud" is emboldened to emphasize it as did Mrs. McDill.) That was enough for the doctor. Immediately after that, the doctor said he had a muscle sprain and needed a few more days to recover. Mrs. McDill asked if she did not think that an MRI was in order. Whereupon, displaying some degree of insult if not anger, the doctor said the examination was complete and the mother and daughter should take Mr. Arpin home at that time. Mrs. Arpin had to stop the doctor, who was quickly leaving, to ask for the work release that Mr. Arpin would need to stay off work. Mrs. McDill, expressing her own insult if not anger, took note that the doctor didn't stay to help them get her

father off the examining table which, of course, turned out to be just as much of a struggle as getting him up there had been.

12.     Dr. Khan, at the time of the examination of Ronald Arpin on September 24, 2001, was a second year resident.  In other words, she was in her year of residency that followed her year of internship.  It could also be called her first year of residency if one did not refer to her internship as a year of residency.  However, the parties stipulated to the terminology that she was a second year resident and that seems to be recognized in this medical community as something understood to mean the year after  she was an intern.  At the time, she was practicing medicine in the State of Illinois on a temporary license.  Dr. Khan graduated from Deccan College of Medical Sciences, Hyderabad, India in 1996. (SLU Def. Ex. 8.)

13.     The Family Practice Center is the clinic structure operated pursuant to a contractual understanding between the 375th Medical Group of Scott Air Force Base, St. Elizabeth's Hospital, and St. Louis University. (See the second part of Plaintiff's Ex. 11.)  It was explained during trial that there is a civilian half of the clinic and a military half.   There are military residents and civilian residents.   Moreover, preceptors, attending physicians, who are on duty for the purpose of supervising the residents may be either military or civilian and their supervision is not segregated to one type of resident or another.   On the 24th of September, the preceptor on duty was Dr. James W. Haynes, now a Lt. Colonel of the United States Air Force.  At the time, however, he was a Captain.

14.     Dr. Haynes was new to the Belleville Clinic and faculty in August of 2001. (See

USA Def Ex. 24.) He did not recall, in fact, working with Dr. Khan prior to this particular day.  In 2001, Dr. Haynes testified that he did not know what Dr. Khan's education was.   He did not know where she went to medical school.  Dr. Haynes further testified that he did not know how well Dr. Khan did in medical school. He did not know when she graduated from medical school or whether she was at the top or bottom of her class.  Dr. Haynes testified that he has not seen her curriculum vitae.   He also testified that he had not seen any documents attesting to her performance during her first year of internship, but does know she progressed from the first year to the second year.  Dr. Haynes testified that, other than progressing from the first year to the second, he did not have any knowledge as to whether Dr. Khan was a good intern, a great intern, an average intern, or a lousy intern.

15.    Dr. Haynes agreed that it was his responsibility to supervise Dr. Khan on September 24, 2001.

16.    Dr. Haynes has no idea whether, on September 24, 2001, it was the first time he had worked with Dr. Khan or whether he had worked with her before that day. He would agree, however, that this literally could have been the first time he worked with her.  Dr. Haynes could not testify that he had, prior to September 24th, ever gone in with Dr. Khan and observed her take a history from a patient, evaluate a patient, conduct a physical examination and then listen to her presentation based on those examinations.  Despite that, he believed that he individualized his supervision of her in listening to her three minute presentation of her history and exam of Mr. Arpin.

17.     The purpose of the interaction between the resident and the preceptor is to allow the interactions to involve the educational process so that a house officer (resident) or medical student will have the opportunity to conduct a medical history and perform a physical examination, while corroborating those findings from a somewhat more experienced perspective.  (Pollock 9/15/2006 deposition, page 9, lines 11 - 18.)

18.     Dr. Khan who, this Court believes, chose to ignore some of the symptoms conveyed to her by Mr. Arpin's wife and daughter, did not ignore one of the more important ones.  The Court's inference is as follows.  Dr. Khan had an opportunity to examine the ER record and could glean a good deal of information from one of her colleagues there; not wanting to vary from the diagnosis but hearing a very large man scream out in pain as she tried to push his leg straight on an examining table, having just approved an entire month off work for Mr. Arpin and needing to justify it despite recording a conservative exam, Dr. Khan needed  something to back up her time-off work note, so she remembered to tell Dr. Haynes about the patient's claim of an increase of pain, which was significant to begin with.  On the other hand, Dr. Haynes on this issue has stated all of the following: that such a discussion was not part of his conversation with Dr. Khan; that he did not discuss it with Dr. Khan; that he does not recall discussing it with Dr. Khan; and that he is not denying she told him, he just doesn't recall her telling him.  Suffice it to say, that Dr. Haynes' credibility on this particular issue is nonexistent in the Court's judgment.

19.     In fact, it is the Court's inference that Dr. Haynes denies being told of that

10

symptom because he knows of its significance and that he cannot justify not seeing the patient if one concludes that he knew of that symptom.  He even said if he knew of that symptom it would have raised his suspicions and he would have gone in to see the patient.  The Court finds that the preceptor lacks credibility on this issue. Based on the credibility of the testimony received, Dr. Khan saying she told Dr. Haynes and he denying it, the Court finds, on this issue, Dr. Khan more credible and finds that Dr. Haynes knew that Mr. Arpin was suffering from an increase in pain from when he was previously seen in the ER.  That means, even on a regimen of Vicodin and Flexaril, Mr. Arpin's pain had increased from a 8/10 to something even greater.

20.    Dr. Haynes testified that if he had known that there was an increase of pain, he would have gone in to see the patient because it would have made him suspicious. This is significant because Dr. Haynes testified that had he gone in he would have gone over the history himself and, in looking at the written exam notes there is already some psoas pathology noted, so his questions to the patient undoubtedly would have led him to a conclusion of psoas pathology.

21.    The Court does, however, believe Dr. Haynes when he says that Dr. Khan did not tell him that Mr. Arpin could not lay down.  It is clear from the evidence that Dr. Khan did not know, at the time of her examination of Mr. Arpin, about psoas pathology and the importance of the combination of symptoms that point to that pathology.  Even at the time of trial, she disagreed with Dr. Haynes that the standard of care required for a proper diagnosis that she learn about the duration of a patient's pain, to learn if the patient's symptoms had progressed, to learn if the

11

patient's symptoms had gotten worse or better, to learn what factor's make a patient's symptoms worse or better or if there are any associated symptoms and she did not necessarily agree with Dr. Haynes that learning what factors relieve or exacerbate symptoms is essential in a differential diagnosis.

22.     A CT Scan or MRI would have shown the collection of blood or fluid pooling in and around the psoas muscle, which together with the other symptoms, would have indicated a need to drain the liquid for testing.  Tests likely would have confirmed the presence of bacteria, which could have been treated with antibiotics. Had Mr. Arpin been treated for an infection on September 24th, 2001, it is more likely than not that an outcome different than his death would have been achieved.

23.     Dr. Khan only saw six patients on September 24th.  At most, Dr. Haynes could have been supervising four residents, although he could have been supervising less. If any of them were first years, they could only have seen four patients and if third or fourth years, they would have topped out at eight to ten patients.  The records of exactly how many patients were seen in total that day were not available, but considering the maximum, would not stretch the limits of time too greatly.

24.     The day after the fateful examination, September 25th saw things get worse. At that point in time, no longer able to get up to use the bathroom, Mrs. Arpin simply placed a bucket by the recliner to act as a chamber pot.  But it wasn't long before it wasn't needed because urination stopped all together.  His renal functioning was beginning to deteriorate.

25.     The next day, September 26th, illustrated damaged brain function as he began

hallucinating.  He asked his one son about people and birds on the porch.  He asked another about the thorns or barbs around his ankle.  He wanted his wife to get the stranger (male) off the couch.  All nonexistent imaginings, of course.  The family decided they had to take him to the hospital again and he was conveyed via ambulance.  When a doctor asked Mrs. McDill what was wrong with her father, she simply and desperately told him her dad was dying and somebody had to help him.  Perhaps she was trying to be dramatic to spur some action finally or perhaps she was prophetic.

26.     It is interesting to note, at this point, that the United States' expert takes comfort in noting that at two points in the history recorded in this hospitalization, in the typewritten admit note and the similar discharge summary, there is an indication that the so-called associated symptoms (sweatiness, clamminess, pallor, shortness of breath) did not start until after the Family Practice Clinic visit on the 24th.  However, in the handwritten note titled Physician's Record  in the emergency department, it is written, "Pt presents to ER c/o diaphoresis [profuse sweating] & 'not feeling well' X 3 days."  A similar record is also handwritten and found in the emergency department records and is entitled Emergency Department Triage Documentation.  It likewise talks about the "associated symptoms" and mentions the times 3 days period.  A nurse's note on a page entitled Cardiovascular/Critical Care Unit Record page 3 dated to the left 9/26/01 underneath Dr. Haynes name, next to the time 1520, reports, "wife states he has been diaphoretic, clammy & short of breath for past 4 days --------"   (See, Plaintiff Ex. 5.)  The Court certainly finds more

13

reliable corroboration from the handwritten notes than the typewritten notes since the handwritten notes are real-time recordings from persons family members giving the history.  No attribution is given by the historian for the typewritten notes. Furthermore, this comports with the testimony of the family when they testified that Mr. Arpin was sweating on the 23rd during the dinner, which he did not participate in, and each would talk to him from time to time and find him in a diaphoretic condition.

27.     Because of difficulty with oxygenation, Mr. Arpin was placed on life support the first day of his hospitalization.  He was not removed from some form of life support until his death when he was removed from life support after being declared brain dead.  Ironically, this was after he was in the MRI machine and after his second heart attack when a nurse finally decided the haywire technical reports might just be the patient instead of the machine itself.  (Only his death could end the insults piled on this poor man's injuries and his family's grief.)

28.     CT Scanning confirmed the psoas abscess on September 27, 2001.  It also demonstrated that the retroperitoneal abscess was encroaching into the epidural space or vice versa.  (See, Plaintiff's Ex. 5.)

29.     Dr. Paul Schroeder drained between 1 and 2 cc of red fluid from the L4-L5 level on the right side of Mr. Arpin.  (Schroeder 2/16/2004 deposition, page 12, lines 3 - 9.)

30.     Dr. Schroeder is unable to give an opinion regarding the length of time the abscess had been present in the patient or its chronicity.  (Schroeder 2/16/2004

deposition, page 15, lines 2 - 3.)

31.     Dr. Haynes opined that Mr. Arpin suffered during his last days and specifically during his hospitalization.  In emotional testimony, the Arpin family testified that Ronald Arpin suffered during his last days.  When asked how she knew her husband suffered, Jeannine Arnis testified that tears came from his eyes and rolled down his cheeks.

32.     Ronald Arpin's body expanded so much that if one touched it there was risk of it cracking or at least seeing the imprint of fingers lasting long after the touch.  His feet were swollen so large that the skin could not accommodate its expansion and it simply cracked open of its own lack of indulgence.  When the decision was made to transport him by air to St. Louis University Hospital, in what was thought the last desperate attempt to save Mr. Arpin, he was technically too heavy for the guidelines by some few pounds and some accommodation had to be finagled to make it happen.

33.     During the St. Elizabeth's hospitalization there are notations such as "facial grimace when turn L side;" "grimaced with oral care;" "BP cuff on R arm causing a skin tear;" "repositioned rectal probe - pt's eyes already open but did open much wider."  Mr. Arpin received dialysis while at St. Elizabeth's.  (See Plaintiff's Exhibit 5.)

34.     At St. Louis University Hospital he still received dialysis treatments.  He was heavily sedated, but when conscious answered question with one blink of his eyes for a yes and two blinks for a no.  (See Plaintiff's Exhibit 6.)

35.     Dr. Alan A. Pollock has been practicing medicine since 1977.  He is an

15

attending physician at Lenox Hill Hospital and a consultant in infectious diseases. In the morning he makes rounds with patients and makes service rounds with house officers.  In the afternoon, he sees his patients and consults for other physicians at his private office.  (Pollock 9/15/2006 deposition, page 6, lines 13 - page 7, line 3.)

36.     Dr. Pollock is a Diplomate of the National Board of Medical Examiners (1973), the National Board of Internal Medicine (1975), and the National Board of Infectious Diseases (1978). (Pollock CV, Pollock 9/15/2006 deposition, deposition Exhibit 1.)

37.     For thirty years prior to his deposition in this case, Dr. Pollock has been involved in the supervision and teaching of medical students, interns, residents, and fellows, which involves the interaction of listening to case presentations, examining patients with each category of novice physician aforementioned and discussing in detail the management strategies of patient care with them. (Pollock 9/15/2006 deposition, page 8, line 22 - page 9 line 10.)

38.     Dr. Pollock is an Assistant Professor of Medicine at New York University School of Medicine, which involves the teaching of medical students who rotate through the infectious disease service or internal medicine service at Lenox Hill Hospital.  (Pollock CV, Pollock 9/15/2006 deposition, exhibit 1 and September 15, 2006 deposition, page 9, line 22 - page 10, line 13.)

39.     Dr. Pollock's court testimony is divided about 57% for the defense and 43% for the plaintiff's side of the litigation. (Pollock 4/9/2004 deposition, page 38, lines 12 - 19.)  As for file reviews, the breakdown is about 50/50. (Pollock 4/9/2004 deposition, page 39, line 7.)

16

40.     Dr. Camins, the government's expert witness,  graduated from medical school in 1997.  He was a Chief Resident in infectious diseases the year that this matter took place and did not become Board Certified in infectious diseases until 2004.

41.     Dr. Foley, the expert hired to testify for Dr. Khan, graduated medical school in 1983 and was Board certified in Family Practice in 1986.

42.     In 1997, Ronald Arpin earned $26,506.; in 1998, $44,817.; in 1999, $32,373.; in 2000, $37,388; and, in nine months of 2001, $26,990 (annualized to $35,986.). His average earnings for the five year period was $35,414. per year.  His wife testified that he would have worked until he was 65 years old, or about another 10 years.

43.     This Court has not seen a family as close or cohesive as the Arpin family.  Nor has the Court seen a family as dependent on one member as the Arpin family was on the patriarch, Ronald Arpin.

44.     Ronald Arpin left a wife and four grown children.

45.     Jeannine Arpin does not drive.  She did not work outside the home.  She was a traditional (read: "old fashioned")  American housewife.  She took care of the cooking and cleaning in the house and Ronald was the man of the house.  He was the breadwinner and provided warmth and security for her and the children.  Everyone knew he was there, always would be and all would be okay with the world as long as he was.  Because she did not drive, Mrs. Arpin counted on her husband to take her places to get things for the house, groceries and the like.  He worked the evening shift so he could take care of things during the day and eat supper with the kids before he left for work.

17

46.     Every night before her husband came home from work at 1:00 a.m., Jeannine Arpin laid out her husband's bath towel, wash cloth, soap and pajamas.    She continued to do so many months after his death because even though she knew he couldn't come home, she knew "he would if he could."  In the old days, when the kids were in school, he always got up and got them off to school.

47.     For a time, Mrs. Arpin lost her health insurance and it wasn't until very recently when she was qualified for a military benefit by virtue of her husband's exposure to agent orange that she was able to become insured again.

48.     Mrs. Arpin misses her husband greatly.   She misses their walks, going to church together, going everywhere together, because she doesn't drive. She especially misses his hugs.   They used to sing to one another.   The night before they took him down for that fateful MRI, she sang to him one last time, "Let me call you Sweetheart."

49.     The family discussed, with fond memories, that prior to the death of Ronald Arpin, there were Sunday dinners every week.   It was something they always counted on and to which they looked forward.   They liked that family togetherness.   However, since his death, there have not been any Sunday family dinners.   Depending on who is describing the difference, it is spoken of as "so sad" or "it is hard."   "Mom is not as happy as she used to be."   Ronald Arpin held this family together and he is not around to perform that role any more.   He was such a dominating influence in this family's existence, it is a role can never be filled.

50.     Ron Arpin, 39, is the oldest offspring of the Arpins.   He described his father

as his "best friend."  On a regular and frequent basis, together they would fish, hunt

and go to the stock car races.  He doesn't go around the family much any more.  It

is just too hard.  It is hard for him to see his Mom not happy.  It is hard for him to

see his brother taking the death of their father so hard that he drinks heavily and

can't hold down a job.  He just can't be a part of the family.  If you are at the house,

you have to go through the master bedroom to get to the bathroom and all of his

Dad's things are still in there and the emotions all come back.  One of his sons will

get his Grandpa's picture down after his football games and, talking to the

photograph, tell him about the good things that happened during the game.

51.     Ron Arpin, in preparation for the medical personnel to pull the plug on the life

support equipment, got in the bed with his Dad and said, as he took his Dad in his

arms, "it's okay Dad."  Then the plug was pulled and in a couple of brief seconds, this

family lost their focal point and patriarch.

52.     Steve Arpin, 37, is the second oldest child of the Arpins.  He, too, describes his

Dad as his best friend.  He was living with the Arpins at the time the events of this

tragedy unfolded.  He has lived with them most of his life.  He quit his job to be with

his Dad at the hospital and has not been able to hold a job since his death.  He is an

alcoholic.

53.     Steve remembers his Dad at both hospitals and how he suffered and blew up

so big you could not touch him.  At St Louis University he remembers how his Dad

"went to the bathroom on himself." [See Plaintiff's Exhibit 6 for repeated notes of

bowel incontinence.] He tries to block the memories with whiskey.  He started

19

drinking again right after his Dad died.  He drank for six months and then quit and started going to meetings again.  He worked.  That lasted six months and he started drinking again.

54.     Steve suffers from depression and is on medication.  He testifies that his Dad was always "there for him."  He describes his drinking as different since his Dad has died.  The Court infers that his drinking is worse and is combined with depression and a sense of foreboding.

55.     Pamela Arpin McDill, 33, is the oldest daughter, third in line among the children.  She felt her Dad was in good health before all of this tragedy unfolded.  Her Dad walked with her and she fished with him at least once a month, weather permitting. She went to the stock car races with him.  She testified, in fact, that all her siblings went to the races with her Dad and some grandchildren as well.  She watched professional wrestling with him.  She grew up learning to feel safe when he came home at night and he told her and her sister that they'd always be his little girls and he'd always take care of them.  The believed he would always be there.  They were and he was always there for him as far as Pamela was concerned.  Pamela came by her parents house  every morning at 8:00 a.m. "because she missed them" and ate breakfast with them and watched a little television, for forty-five minutes before going on to work.  As has already been highlighted, she also saw them every Saturday and Sunday (for fishing, stock car races, and Sunday dinner).

56.     Since her Dad has died, Pamela pointed out that there hasn't been one big family dinner.  She misses her Dad very much: the walks, the hugs, fishing (which

she doesn't do because the memories are too painful).  She goes to her Dad's grave and talks to him and tells him how much she misses him and loves him.  There isn't a day that goes by without some part of it devoted to thinking about her Dad.  She even listens to his favorite radio station, just because it was what he listened to and it is a way to be close to him.

57.     The youngest of all the offspring, Cheryl Stalls, 31 at the time of the trial, made sure everyone who attended her wedding and in particular her groom's family knew that she had a father and good one at that.  She put his picture on the back of the program with a poem.  She said her Dad was everything.  He was honest and taught all the children to be honest.   She stopped going to her parents' house after her Dad's death because she couldn't stand to be in the house anymore.  It is just too sad there for her.

58.     The bills can be found at Plaintiff's Exhibit 8.  There is evidence to substantiate all the bills, except the ambulance bill on 9/20/01, and St. Elizabeth's bill on 9/20/01. Those costs predate the claims against the defendants in this litigation and have nothing to do with the issues at bar.  The bills attributable to the defendants' negligence in this case are:   Medstar Ambulance: $372.80; St. Elizabeth's Hospital $55,885.25; Arch Air Medical Services $5,800.00; St. Elizabeth Belleville Family: $660.00; Belleville Radiologists $1,319.00; Neurological Service Belleville: $195.00; Dr. Zahid $1,570.00; SLUCARE-St. Louis University $5,845.00; and, St. Louis University Hospital $87,014.26. Also,Valhalla Funeral Home: $2,207.96.

### III. **Conclusions of Law**

59.    Mr. Arpin suffered a fall on the night of the 19th of September, 2001.  His symptoms on the 24th were indicative of much more than just an uninfected hematoma. (Pollock 9/15/2006 deposition, page 82, lines 9 - 15.)

60.    There isn't a distinction between a psoas hematoma infected by staph aureus and a psoas abscess. (Pollack deposition, April 9, 2004, page 8, lines 12 - 19.)

61.    The Illinois Supreme Court has held that the standard of care "requires a physician to possess and to apply that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstanced." *Purtill v. Hess*, **111 Ill. 2d 229, 242 (Ill. 1986).**

62.    The Court finds that the symptoms that were present during the examination by Dr. Khan: diaphoresis, clamminess, pallor, shortness of breath, inability to lie prone, inability to straighten his leg, increase in pain over the past few days, information about his most comfortable position including sitting in his recliner with his hip and knee flexed; were all indications of a developing psoas abscess in Ronald Arpin that should have been recognized by Dr. Khan or in the exercise of reasonable care should have been discovered by Dr. Khan.  Contrast the time in the ambulance on the way to the emergency room when he was suffering a great deal of pain and none of those so-called associated symptoms were present.  It seems pain alone did not cause Mr. Arpin diaphoresis, clamminess and pallor.  The presence of infection

was obviously the cause.

63.    Based upon a reasonable degree of medical certainty, Dr. Pollock finds corroboration in the medical records of the hospitalization at St. Elizabeth's hospital on September 26, 2006 for those associated symptoms, which the wife and daughter of Ronald Arpin insist that they described to Dr. Khan (diaphoresis, clamminess, pallor, and shortness of breath), and states that he believes those symptoms were present at the time of the examination by Dr. Khan on the 24th. (Pollock 9/15/2006 deposition, page 41, line 15 - page 45, line 10; page 46, line 2 - page 47, line 17.)

64.    Dr. Khan suggests that the way in which Mr. Arpin rotated his knee internally rather than externally was the opposite of what the literature says about common symptoms associated with psoas abscess.

65.    Based on all the evidence, the Court could infer that such a symptom is, indeed, an anomaly or even an indicator pointing away from psoas pathology as suggested by Dr. Khan.  However, in light of the other symptoms, including the nature of the fall, the fact that Mr. Arpin landed on his right hip, the associated symptoms of diaphoresis, clamminess, pallor, shortness of breath, increased pain, inability to lie prone, inability to straighten the right leg without severe pain, comfort coming from flexing the hip and knee on the right side  and  acute pain on the right hip (creating a need to relieve the weight from it that would not  be achieved with external rotation), the Court finds that when one takes into account the opinions of Dr. Haynes and Dr. Pollock, there was ample medical evidence to infer that instead it fits with all the symptomatology of psoas pathology.

66.     To a reasonable degree of certainty, on September 24, 2001, either a CT scan or an MRI scan would have probably shown the psoas pathology present in Ronald Arpin, and the standard of care required the utilization of one study or the other on that date.  (Pollock 9/15/2006 deposition, page 39, line 22 - page 40, line 13.)

67.     It is Dr. Pollock's opinion that Dr. Khan departed from accepted standards of medical care by not ordering an MRI or CT scan to explore possible etiologies for Mr. Arpin's pain and symptoms and also by not having the attending doctor to come in to see the patient.  (Pollock 4/9/2004 deposition, page 60, lines 3 - 23.)

68.     Suggesting that Dr. Khan's diagnosis was in error, it was pointed out during Dr. Pollock's direct testimony that no finding was made by her of a surface hematoma over the right hip, which would have been expected, according to Dr. Pollock,  given the history of the kind of fall described and the soft tissue injury she diagnosed of the hip.  (Pollock 9/15/2006 deposition, page 45, lines 12 - 25.)

69.     Dr. Paul Schroeder is of the opinion that psoas abscess is a common occurrence. (Schroeder 2/16/2004 deposition, page 10, lines 9 - 12.) Dr. Pollock felt it was not so common.  (Pollock 4/9/2004 deposition, page 33, line 21.)  However, it is hard to determine how often it occurs, according to Pollock,  because it is not a disease that must be reported to the Center for Disease Control. (Pollock 4/9/2004 deposition, page 33, line 25 - page 34, line 10).  Dr. Pollock has seen 25 or 30 cases himself. (Pollock 4/9/2004 deposition, page 36, line 10.) Clearly, psoas abscess is a common occurrence and should be recognized by a family practitioner.

70.     The standard of care established by a document bearing the precepting

expectations by faculty at the Family Practice Center in Belleville, where this examination took place on September 24, 2001, states that "[t]he preceptor is responsible for ensuring that appropriate care is provided to the patients by the resident." Also, "[i]n that capacity, the preceptor must constantly be kept apprised throughout the clinic session of the resident's activity and patient contacts. The preceptor must be aware of what patients and for what reasons the resident is providing care." (Pollock 9/15/2006 deposition, page 27, line 14 - page 28, line 25; Pollock 9/15/2006 deposition exhibit 3; plaintiff's trial exhibit 13.)   In giving an opinion that the preceptor did not take his own history, did not make an effort to examine the patient himself to either confirm or modify the resident's findings and that Dr. Haynes was negligent in not supervising his resident in training, the Court infers that Dr. Haynes failed to perform according to the above stated standard of care as outlined in the clinic's expectations of the faculty.

71.    Standard of care requires that in exercising supervision over a resident, a preceptor must individualize that supervision to the particular resident based on that resident's level of training, past performance, fund of knowledge, judgment, and technical skills.  Dr. Haynes agrees that the standard of care requires this kind of individualization in the course of properly supervising a resident. Dr. Khan disagrees with her preceptor, but the Court finds her position untenable.  Dr. Haynes was not in the program during Dr. Khan's first year of residency.  He did not know anything about her medical education on September 24th, he did not know anything about her past performance, her fund of knowledge, her judgment or her technical skills.  Dr.

25

Haynes had a three to five minute conversation with Dr. Khan about Mr. Arpin following her examination of the patient. He tried to convince the Court that he somehow individualized his supervision of Dr. Khan during that conversation. He did not say how he learned of her level of training in five minutes, her past performance, fund of knowledge, judgment or technical skills. The Court finds that Dr. Haynes did not individualize his supervision of Dr. Khan. Dr. Haynes agreed with what the Court has stated here regarding what the standard of care requires, though he, of course, disagrees with the Court's conclusion that he violated that standard of care. This individualization of supervision overcomes the primary care exception touted by Dr. Camins as the reason why Dr. Haynes would not be required to go in and examine each of his residents' patients.

72.     Dr. Pollock learned from the records that the interaction between Dr. Khan and Dr. Haynes was relatively brief, a matter of a few minutes. He is of the opinion that if that is true, it would be hard for Dr. Haynes to have gleaned very much from a presentation that lasted only a few minutes. Dr. Pollock believes that the findings on physical examination by Dr. Khan were misinterpreted as they were reported to Dr. Haynes. He believes the patient did, in fact, have a psoas sign, but it was not obvious or known to Dr. Khan. The presence of the psoas sign is an important and ominous physical finding, which obviously needs further investigation. (Pollock 9/15/2006 deposition, page 22, lines 10 - 25.)

73.     Even though the Court has found the facts to be to the contrary, it is interesting and telling to note that even if Dr. Haynes does not recall Dr. Khan telling

him about Mr. Arpin suffering an increase in pain or doesn't believe that she did, but assuming she did not, Dr. Haynes does agree that he should have asked Dr. Khan about the character and quality of the patient's pain.  When advised of those symptoms, he could have been caused to go in and see Mr. Arpin.  Once with the patient, Dr. Haynes would have asked all kinds of questions about Mr. Arpin's pain, including the fact that he could not lie flat, his greatest position of comfort, and his flexion issues.

74.    Dr. Pollock is of the opinion that had Dr. Haynes been told that the patient's pain had increased (and even if he had not been told that), Dr. Haynes should have gone in to see Mr. Arpin.  The fact that the patient's pain has increased is considerably more important in view of the prior history.  In the emergency room the pain was 8/10 and required a substantial amount of narcotic analgesic for control. His visit to Dr. Khan on the 24th was associated with an increase in the severity of the pain, presumably from an 8 to a 9 or 10 out of 10, as bad as it gets.  So something had changed for the worse and the question is what has changed. (Pollock 9/15/2006 deposition, page 23, line 15 - page 24, line 18.)

75.    Dr. Haynes opined that in light of the retroscope that was performed at St. Elizabeth's at week's end, Mr. Arpin most likely was developing the abscess when he was in his office on the 24th.  He goes on to point out that he does not know at what specific point Mr. Arpin was infected.  Although he concedes that by the time the associated symptoms of clamminess, diaphoresis, etc., were present, Mr. Arpin was infected.  The Court finds, from an examination of all the evidence in the case, that

Ronald Arpin was, in fact, developing a psoas abscess on September 24, 2001, at the time he was examined by Dr. Khan.  Further, the Court finds that if Dr. Khan had performed an examination required of her by the standard of care, she would have or should have discovered the developing psoas abscess.

76.   Dr. Haynes confirmed that Mr. Arpin suffered the last days of his life.

77.   Dr. Haynes testified that if treatment of the psoas abscess began on the 24th of September, bacteremia and septic shock could have been prevented, in turn, multiple organ failure could have been prevented and ultimately Mr. Arpin's death could have been prevented.

78.   Dr. Haynes' opinion as to the standard of care required for an attending physician overseeing a second year family practice resident as of September 2001 was to supervise the care they deliver, to be available to supervise the care they deliver, and to intervene when necessary.  He further opined that he met that standard of care on September 24, 2001.  However, the Court concludes that he did not.  It is the Court's finding that he did not individualize his supervision of Dr. Khan as he also testified the standard of care required of him.  He failed to supervise her as this standard required of him, in that, when she advised him that the patient was suffering an increase in pain he failed to follow-up with more questions of the examining second year resident or, more importantly, his own examination of the patient.  In that regard, he also failed to intervene as this standard required of him. He should have examined the patient when advised that his pain had increased from an 8/10.

28

79.     Dr. Haynes could not have been supervising more than four residents the morning of the 24th of September, 2001. From interrogatory answers, it is known that Dr. Khan was assigned to see six patients. Dr. Haynes was not allowed, according to the regulations, to see his own patients that morning, in order to make himself fully available to supervise the residents. The record is absent regarding how many other residents Dr. Haynes actually supervised that morning and how many patients each resident examined, but plaintiff's counsel makes the point that if each presentation took the same amount of time as Dr. Khan's presentation on Mr. Arpin did, the suggestion that there isn't enough time in the morning for the attending to devote time to each patient is disingenuous.

80.     The Court did not find Dr. Camins testimony credible. Substantively, he is not as experienced as the other experts rendering opinions in this case. During his cross examination, Dr. Camins was evasive, combative, and unreasonably defensive. When taken in the light of all the evidence in this case, his conclusions are not believable.

81.     Dr. Foley's opinion is in direct contravention with the opinion of Dr. Haynes. He says that even if you add in the associated symptoms of diaphoresis, ashen appearance and clamminess that there would be nothing to suggest further inquiry by the examining physician. On this, Dr. Foley has no credibility. Even the doctor who is on trial, Dr. Haynes, concedes that if those symptoms are present, one must go further and investigate what is going on.

82.     Dr. Striegel, who is a general surgeon and consulted when Mr. Arpin was in St. Elizabeth's Hospital on September 26, 2001, was of the opinion that his retro

psoas abscess had gone undiagnosed and untreated so long and had spread into the epidural area, developing overwhelming sepsis by the time he got to the hospital, such that he was too unstable, making him unable to be a surgical candidate. (Striegel 4/3/2003 deposition page 8, lines 1 - 22.)

83.    Based on a reasonable degree of medical certainty, as a direct result of Dr. Khan's and Dr. Haynes' negligence, the psoas abscess remained undiagnosed and progressed.  Complications included stphylococcal bacteremia, septic shock, multi-organ failure and death.  Within a reasonable degree of medical certainty, had a CT scan or MRI scan been obtained on September 24, 2001, before the patient developed septic shock, the fluid collection in the psoas muscle would have been easily visualized.  A drainage procedure, gram stain and culture could have been done promptly, and high dose intravenous antibiotics begun prior to the development of septic shock, thereby preventing the patient's death.   (Pollock 9/15/2006 deposition, page 19, lines 2 - 22.)

84.    Plaintiff's wage loss in this case is $354,140.00.  In arriving at this figure, the Court found that Plaintiff was entitled to damages arising in the future because of loss of earnings.  Because neither side introduced evidence regarding the method that the Court should employ to compute the present cash value of those damages, the Court decided to employ the "total offset method" - a method that assumes, purely for the purpose of calculating the present cash value, zero inflation of wages, thereby making it unnecessary for the Court to discount those wages.  This method has been approved of by the Illinois Supreme Court.  ***See Richardson v. Chapman,*** **175**

**Ill.2d 98, 108-109, 676 N.E.2d 621, 626 (Ill. 1997).**  Specifically, the court took Mr. Arpin's average salary over the past five years ($35,414.00) and multiplied it by the number of years Mr. Arpin would most likely have continued to work (10) to arrive at the figure of $354,140.00.

85.    The Court finds, as heretofore illustrated,  that Ronald Arpin suffered a great deal of pain, both emotionally and physically in the days before his death.  Those damages survive his death and are recoverable in the survival action.  The Court finds that pain and suffering to be valued at $750,000,00.

86.    The Court has noted the loss Ronald Arpin has meant to his family.  It is difficult to put a value on something that is priceless.  Mrs. Arpin is far more dependent on her husband than are her children.  Her children have suffered the loss of a father that is great and the devastation to this family is immeasurable.  The Court assesses the loss to Mrs Arpin, in the wrongful death action, to be $4,000,000.00, and for each of the children to be $750,000.00., for a total of $7,000,000.00.

## IV.  CONCLUSION

For the wrongful death counts against both defendants, **Counts I and III**, the Court awards damages in the amount of **Seven Million dollars ($7,000,000.00)** , apportioned as follows: Jeannine Arpin $4,000,000.00, Ronnie Arpin $750,000.00, Steven Arpin $750,000.00, Pamela Jean Arpin-McDill $750,000.00, and Cheryl Arpin Stallings $750,000.00.  In the survival action counts

31

against both defendants, **Counts II and IV**, the Court awards damages in the total amount of **One Million, Two Hundred Sixty Five Thousand Nine Dollars and Twenty Seven Cents $1,265,009.27**. itemized as follows:  Medstar Ambulance: $372.80; St. Elizabeth's Hospital $55,885.25; Arch Air Medical Services $5,800.00; St. Elizabeth Belleville Family: $660.00; Belleville Radiologists $1,319.00; Neurological Service Belleville: $195.00; Dr. Zahid $1,570.00; SLUCARE-St. Louis University $5,845.00; and, St. Louis University Hospital $87,014.26; Valhalla Funeral Home $2,207.96; wages lost $354,140.00; and, pain and suffering $750,000.00.  Clerk shall enter judgment accordingly.

     **IT IS SO ORDERED**

     This 15th Day of November, 2006.


          /s/               David   RHerndon
          **UNITED STATES DISTRICT JUDGE**