IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JEANNINE ARPIN, as Administrator
of the Estate of RONALD ARPIN,
Deceased,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,
ST. LOUIS UNIVERSITY,
a not-for-profit corporation,

Defendant.                                              No. 04-cv-128-DRH

## MEMORANDUM AND ORDER

**HERNDON, Chief Judge:**

### I. Introduction and Background

This matter comes before the Court on remand from the Seventh Circuit in order to redetermine the loss of consortium damages awarded by this Court. *See Arpin v. United States*, **521 F.3d 769, 776 (7th Cir. 2008)**.   On November 11, 2006, this Court found Defendants United States of America and St. Louis University joint and severally liable on Plaintiff's wrongful death claim for the death of the decedent Ronald Arpin.  This Court awarded Plaintiff an award of damages totaling $8,265,009.27, representing $158,661.31 in medical expenses, $2,207.96 in funeral

expenses, $354,140 in lost wages, $750,000 in pain and suffering, as well as $7,000,000 for loss of consortium.  The $7 million awarded to plaintiff for loss of consortium damages was broken down into an award of $4 million to Plaintiff Jeannine Arpin, the decedent's wife, and $750,000 to each of Ronald Arpin's four children.  Both Defendants United States of America and St. Louis University appealed the judgment as to the finding of liability and loss of consortium award. The Seventh Circuit upheld the Court's finding as to the issue of liability, but vacated the Court's award of $7 million for loss of consortium and remanded the case back to this Court to determine a proper award for loss of consortium damages or to, at the very least, provide a reasoned, articulated explanation for the grounds of the award.[1]

In remanding the matter back to this Court, the Seventh Circuit provided some guidance, although refrained from going so far as to prescribe an actual method, for determining an appropriate award for loss of consortium.  The Court should start off with the law of this case as has been presented by the Seventh Circuit and then consider *similar* cases, both in Illinois and elsewhere.  The Seventh Circuit, suggested, without absolutely prescribing, a ratio approach to calculating damages for loss of consortium.  In doing so, the Court should examine the average ratio in wrongful-death cases in which the award of such damages was upheld on

---

[1]  In vacating the judgment, the Seventh Circuit found that this Court had not provided an adequate justification for the award of damages, stating that the figures were "plucked out of the air." *Arpin,* **521 F.3d at 776.**  The Seventh Circuit found that this Court should have better explained its reasoning process "that connects the evidence to the conclusion" as required by **FED.R.CIV.P. 52(a)** and noted that it could not sustain the award as it was based on "meager analysis." *Id.* **at 776, 777.**

appeal.  Next, the Court should consider special factors, such as closeness of the spouse and children to the decedent and whether the children of the decedent were minors or adults.  The suggestion, in the precedential case at bar, being that the adulthood of the children would be a downward adjustment, while the closeness of the children would be an upward adjustment.  With this guidance in mind, the Court will analyze the case law with the facts of this case in order to determine the proper award for loss of consortium.

## II.  <u>Analysis</u>

In response to the Seventh Circuit's remand of this matter for further proceedings regarding the loss of consortium damages, the Court directed all three parties to submit briefs on the issue remanded by the Seventh Circuit so that the parties could provide their research on "awards in similar cases." (Docs. 69, 70, 81, 83, 84, 85, 89, & 90).  All three parties submitted briefs with a number of cases as supposed exemplars of what they believed addressed the type of cases that the Circuit Court opinion discussed.  However, instead of responding to the type of cases suggested by the Circuit Court opinion, the parties submitted cases that were either wholly dissimilar or not upheld on appeal.  In the initial submissions by all of the parties, it was clear that the parties only sought to provide cases that, when averaged, upheld their image of what a ratio should look like.  The Plaintiff's reply ultimately

provided cases that met the test of similar and upheld on appeal, although many of the cases cited by Plaintiff still did not involve wrongful death awards to adult children.  What this Court then received as the parties tried to respond to the Circuit Court's directive, even though the opinion clearly stated the approach was "suggested (without meaning to prescribe)," was a hodge-podge of cases that had little or no resemblance to the case at bar.  Not only is the Court asked, by these parties, to compare ratios that are far afield from one another so that an average is meaningless, but the facts of the cases are meaningless as well.

As a consequence of the response of the parties, the Court has done an exhaustive examination of the reported cases in an effort to find similar cases that have been upheld on appeal.  To establish for the record what the trial court deems to be similar, the Court considered a wrongful death case, the decedent being the primary bread winner of the family, leaving a spouse and more than one child (trying to match as close as possible to four children, although not restricting the cases to that number, and attempting to find as many adult children as possible among the surviving children, though not restricting the criteria to only adult children).  While the Plaintiff also submitted cases involving the wrongful death of children on the theory that those cases produced evidence of little or no compensatory damages to reduce as much as possible that side of the ratio, it also had the effect of restricting the number of beneficiaries to two, consequently limiting the loss of consortium side of the ratio.  This, one could argue, makes for a conservative example, but one could also argue for a large jury appeal when the decedent is a child, a factor not present

at bar and, arguably, taking those cases out of the similar category for purposes of comparison.

       After an exhaustive research on the part of this Court, there is only one case that has a family that is even close to the make-up of the family that is in this litigation.  Even still, that case did not have the same kind of evidence about which this Court found to be present in this case.  The award of damages in that case was very similar to the award in this case.  ***See Barry v. Owens-Corning Fiberglass Corp.*, 282 Ill.App.3d 199 (1st Dist. 1996)**.

       This Judge in re-reading his own order readily admits his failure to repeat the findings he placed in the factual portion of the order in the conclusions of law so that the reviewing court could understand his reasoning for his loss of consortium award.   The Circuit Court opinion stated: "All the judge said in explanation of his award of these amounts was that 'it is difficult to put a value on something that is priceless.  Mrs.  Arpin is far more dependent on her husband than are her children.  Her children have suffered the loss of a father that is great and the devastation to this family is immeasurable.'" ***Arpin*, 521 F.3d at 776.**  In repeating what was in the previous order, this is what the undersigned was relying on in determining an appropriate award for consortium damages.  While this Judge only recited the following in the findings of fact and failed to repeat in the conclusions of law portion of the order, the undersigned now recites here to make clear that his damages analysis takes the following into account.

This Court has not seen a family as close or cohesive as the Arpin family. Nor has the Court seen a family as dependent on one member as the Arpin family was on the patriarch, Ronald Arpin.

Ronald Arpin left a wife and four grown children.

Jeannine Arpin does not drive. She did not work outside the home. She was a traditional American housewife. She took care of the cooking and cleaning in the house and Ronald was the man of the house. He was the breadwinner and provided warmth and security for her and the children. Everyone knew he was there, always would be and all would be okay with the world as long as he was. Because she did not drive, she counted on him to take her places to get things for the house, groceries and the like. He worked the evening shift so he could take care of things during the day and eat supper with the kids before he left for work.

Every night when her husband came home from work at 1:00 a.m., Jeannine Arpin laid out her husband's bath towel, wash cloth, soap and pajamas. She continued to do so many months after his death because even though she knew he couldn't come home, she knew "he would if he could." In the old days, when the kids were in school, he always got up and got them off to school.

For a time, Mrs. Arpin lost her health insurance and it wasn't until very recently when she was qualified for some military benefit by virtue of her husband's exposure to agent orange that she was able to become insured again.

Mrs. Arpin misses her husband greatly. She misses their walks, going to church together, going everywhere together, because she doesn't drive. She

especially misses his hugs.  They used to sing to one another.  The night before they took him down for that fateful MRI, she sang to him one last time, "Let me call you Sweetheart."

The family discussed, with fond memories, that prior to the death of Ronald Arpin, there were Sunday dinners every week.  It was something they always counted on and to which they looked forward.  They liked that family togetherness. However, since his death, there have not been any Sunday family dinners. Depending on who is describing the difference, it is spoken of as "so sad" or "it is hard."  "Mom is not as happy as she used to be."  Ronald Arpin held this family together and he is not around to perform that role any more.  He was such a dominating influence in this family's existence, it would not be right for someone to step up and take this place in that role.  That role can never be filled.

Ron Arpin, 39, is the oldest offspring of the Arpins.  He described his father as his "best friend."  On a regular and frequent basis, together they would fish, hunt and go to the stock car races.  He doesn't go around the family much any more. It is just too hard.  It is hard for him to see his Mom not happy.  It is hard for him to see his brother taking the death of their father so hard that he drinks heavily and can't hold down a job.  He just can't be a part of the family.  If you are at the house, you have to go through the master bedroom to the bathroom and all of his Dad's things are still in there and the emotions all come back.  One of his sons will get his Grandpa's picture down after his football game and tell him about the good things that happened during the game.

Ron Arpin, in preparation for the medical personnel to pull the plug on the life support equipment, got in the bed with his Dad and said, as he took his Dad in his arms, "it's okay Dad."  Then the plug was pulled and in a couple of brief seconds, this family lost their focal point and patriarch.

Steve Arpin, 37, is the second oldest child of the Arpins.  He, too, describes his Dad as his best friend.  He was living with the Arpins at the time the events of this tragedy unfolded.  He has lived with them most of his life.  He quit his job to be with his Dad at the hospital and has not been able to hold a job since his death.  He is an alcoholic.

Steve remembers his Dad at both hospitals and how he suffered and blew up so big you could not touch him.  At St. Louis University he remembers how his Dad "went to the bathroom on himself."  He tries to block the memories with whiskey.  He started drinking again right after his Dad died.  He drank for six months and then quit and started going to meetings again.  He worked.  That lasted six months and he started drinking again.

Steve suffers from depression and is on medication.  He testifies that his Dad was always "there for him."  He describes his drinking as different since his Dad has died.  The Court infers that his drinking is worse and is combined with depression and a sense of foreboding.

Pamela Arpin McDill, 33, is the oldest daughter, third in line among the children.  She felt her Dad was in good health before all of this tragedy unfolded.  Her Dad walked with her and she fished with him at least once a month, weather

permitting.  She went to the stock car races with him.  She testified, in fact, that all her siblings went to the races with her Dad and some grandchildren as well.  She watched professional wrestling with him.  She grew up learning to feel safe when he came home at night and he told her and her sister that they'd always be his little girls and he'd always take care of them.  They believed he would always be there.  They were and he was always there for them as far as Pamela was concerned.  Pamela came by her parents house every morning at 8:00 a.m. "because she missed them" and ate breakfast with them and watched a little television, for forty-five minutes before going on to work.  As has already been highlighted, she also saw them every Saturday and Sunday (for fishing, stock car races, and Sunday dinner).

Since her Dad has died, Pamela pointed out that there hasn't been one big family dinner.  She misses her Dad very much: the walks, the hugs, fishing (which she doesn't do because the memories are too painful).  She goes to her Dad's grave and talks to him and tells him how much she misses him and loves him.  There isn't a day that goes by without some part of it devoted to thinking about her Dad.  She even listens to his favorite radio station, just because it was what he listened to and it is a way to be close to him.

The youngest of all the offspring, Cheryl Stalls, 31 at the time of the trial, made sure everyone who attended her wedding and in particular her groom's family knew that she had a father and a good one at that.  She put his picture on the back of the program with a poem.  She said her Dad was everything.  He was honest and taught all the children to be honest.  She stopped going to her parents' house

after her Dad's death because she couldn't stand to be in the house anymore.  It is just too sad there for her.

While the conclusions of law the Circuit Court noted summed up the devastations this family described in credible testimony to the Court, those findings which the Court relied upon in determining damages, established the basis for those damages.

The Defendants in this case failed to give this Court any assistance or guidance in how to derive damages initially.  St. Louis University asked that I be reasonable and thought the Plaintiff's counsel was too high.  The Court did not award as many damages as the Plaintiff's counsel requested.  The United States said the Plaintiff should lose and no damages should be awarded.  Even the Seventh Circuit has agreed that should not be the result.

So how does a trier of the facts, a decision maker of the damages go about determining damages?  Can you put a price on all the Sunday dinners now cancelled because no one can bear to get them together?  Shall the Court assess damages on the basis of the fish that must be purchased at the store for Ms. McDill, but this is for loss consortium not special damages, so we must concentrate on the camaraderie associated with the effort to catch them not the actual catch.  What price goes along with the exacerbating ones alcohol intake, or did it make him an alcoholic or aggravate that?  How can the Court put a price on all of the stock car races, Ms. McDill's morning breakfasts with her father, and hugs from their father?

If the Court were to attempt to pursue the ratio method suggested as a

possible approach by the Circuit, how close must we insist on getting to the facts at bar?  The better question appears to be how far away from the facts at bar can we tolerate from the cases of "precedent" in the sampling before we must say no to including them for their ratios?  It is readily apparent that the cases submitted are so distinguishable as to be outliers.  None of the cases cited by the parties present facts even remotely similar to the factual situation presented in this case.  Both parties appear to have merely "cherry-picked" cases in order to meet the respective ratios they believe should be used in determining the loss of consortium award.  The result were ratios at complete opposite ends of the spectrum making any average of such ratios useless.

This Court's own research turned up one case which had substantially the same facts as the case before it.  ***See Barry v. Owens-Corning Fiberglass Corp.***, **282 Ill.App.3d 199, 668 N.E.2d 8 (1st Dist. 1996) (In** *Barry*, **the Illinois Appellate Court in the First District upheld an award of $6,850,000 in loss of consortium to a 59 year old decedent's wife and seven children, some of which were adults)**.  Even though the ***Barry*** case had similar facts to the case at hand (one surviving spouse and several adult children), the case still fails to measure up to the substantial devastation that this family has suffered in the days since Ron Arpin's death.

The fact that the vast majority of these cases are so vastly different prevents this Court from developing an adequate ratio in which to determine an award for loss of consortium.  Perhaps this inability to find suitable comparison

cases is why the Illinois Supreme Court expressly discourages such comparisons in determining the sufficiency of loss of consortium damages. ***See Richardson v. Chapman*, 175 Ill.2d 98, 115, 676 N.E.2d 621, 629 (Ill. 1997) (Illinois courts have traditionally declined to compare cases in determining whether an award is excessive); *see also Barry*, 282 Ill.App.3d at 207, 668 N.E.2d at 14 (noting that comparisons are difficult if not impossible as each case depends on the unique facts of the case and further noting that there is no exact computation which can measure the sufficiency of an award) (citing *Deerhake v. DuQuoin State Fair Ass'n, Inc.*, 185 Ill.App.3d 374, 541 N.E.2d 719 (Ill. 1989); *Northern Trust Co. v. County of Cook*, 135 Ill.App.3d 329, 481 N.E.2d 957 (Ill. 1985)).** As this Court has stated, it conducted an exhaustive search of the case law and was hard-pressed to find any cases on point with the extreme factual situation before it. The Arpins have suffered a devastating loss and this Court has never before seen a case where the loss of a loved one had such a catastrophic impact on the family as noted above. Therefore, given the unique nature of this case as well as the lack of adequate comparative cases, the Court finds that a ratio approach is infeasible.

So what is this Court left with? How is a trier of fact to determine an adequate award that is not considered to be simply "[plucking an amount] out of the air?" Looking at simple comparisons in loss of consortium awards rather than a ratio approach, the case closest on point is the ***Barry*** case. In that case, which did

not even have the extreme evidence of loss as demonstrated in this case, the Illinois Appellate Court upheld an award of $3,000,000 to the decedent's wife as well as $500,000 to five of the decedent's children, $600,000 to another child, and $750,000 to the decedent's other child.  Further, the ***Barry*** case was awarded in 1996 a full decade before the ***Arpin*** case.  Taking into account inflation, if the awards in ***Barry*** had been awarded at the time of the ***Arpin*** case, the awards would have been substantially higher.[2]  Using a simple comparison, this Court could justify an award of $4,000,000 to Mr. Aprin's wife and $750,000 to each of his children as the ***Barry*** cases' award was substantially similar and yet did not have the unique factual situation which this Court has repeatedly noted.

Therefore, the Court determines that the award to Mrs. Arpin should be $4,000,000 and that each of Mr. Arpin's four children should be awarded $750,000.  This award takes into account the extreme factual situation as previously stated in the Court's findings of fact which has been repeated in this Order, as well as comparisons to similar loss of consortium awards in wrongful death cases.

---

[2]  Using the mathematical formula $(.03x * y) + y$, where "x" equals the number of years and "y" equals the original amount of money awarded, the Court was able to determine the 2006 equivalent (when this Court entered Judgment for the Arpins) of the Barry award taking into account the average yearly inflation rate being 3%.  In such an instance, the $3,000,000 awarded to the decedent's wife would be approximately 3,900,000.  The $500,000 to each of five of the decedent's children would equal $650,000.  The $600,000 awarded to one child would, taking into account inflation, equal $780,000.  Finally, the award of $750,000 would be approximately $975,000.  These amounts are even closer to this Court's award in this case without taking into account the unique evidence presented in this case.

### III.   <u>Conclusion</u>

In conclusion, the Court assesses the loss to Mrs. Arpin, in the wrongful death action, to be **$4,000,000**, and for each of the four children to be **$750,000**, for a total of **$7,000,000**.  The Clerk to enter judgment accordingly.

**IT IS SO ORDERED.**

Signed this 13th day of November, 2009.


*/s/   David R Herndon*

**Chief Judge**
**United States District Court**